Case number 24-7064. Charles Turpin and Regina Jackson at balance versus District of Columbia, a municipal corporation, and Michael Chen, officer, in his individual capacity. Mr. Presley, for the balance. Mr. Phillips, for the appellees. Morning, counsel. Mr. Presley, please. See you when you're ready. Good morning. May it please the court. My name is John Presley. I'm here on behalf of the appellants, Mr. Charles Turpin and Regina Jackson. There are a lot of issues in this case. I wish to direct my attention at this point to a couple of key issues, I think, that are most important. I indicated the significance of what I call the colloquy which took place between Mr. Turpin and Officer Lorraine. Now, that colloquy, which basically stated as follows, very succinct, with some indulgence here. Now, I apologize. Okay, here we are. I'm sorry. The colloquy that I reference is as follows. This took place once the officers and so forth were in Mr. Turpin's apartment, and at some point during that time, Mr. Turpin asked the following question, how is it that you are able to be in my house and you understand what I'm saying? Officer Lorraine responds by saying, we're here because we got a call for service. Mr. Turpin states, I didn't call you. Officer Lorraine remarks, okay, I understand that. That's a very short colloquy, but it carries a lot of weight. But don't we need to put that into context, like the actual time that that occurred? In other words, there was an initial invitation to come in, then the officers eventually follow Mr. Turpin toward the bedroom because Mr. Turpin is the one who says, there's my girlfriend, basically, she's right here after the officer said, you know, who else is here? So don't we need to kind of put that in context as to when that exactly occurred? That's not at the initial onset of all of this. That's a very important question, Your Honor, and I was going to get to that because the trial court indicated that it was taken out of sequence and as a result, it wasn't relevant to what happened later. And would you agree that that did not occur right when the officers came to the home, right initially? Because then to me, that was an important question to suggest, I'm not inviting you in, you need to tell me why you're here. Correct. It did not occur at the beginning. It occurred later. As a matter of fact, they were in the bedroom at that time. My argument is that once... I'm going to agree that up until the bedroom scene, the officers were appropriately there. With consent of Mr. Turpin, or at least no revocation of consent. I do not consent that. I'm sorry. I do not agree that there was consent, but I think that what is clear is once the colloquy took place, and once Mr. Turpin basically says, well, why are you here? Which basically says, well, what authority do you have? From that point, it's clear that even if arguendo, there was consent. At that point, it ends. And it's clear that... Wouldn't that be at the point where the officers had already seen the drugs? No. And that's another important point. The drugs issue was not brought up until after the colloquy. Up to that point, there was nothing said about the drugs and so forth. And also, what is very telling, obviously, about what Mr. Turpin says, he says, how is it that you are able to be in my house and you understand what I'm saying? If, in fact, Officer Lorraine believed that there was consent, the response to that would have been, well, Mr. Turpin, we're here because you consented to our coming. It's hard for me to believe that an officer on the scene, when we're taking into account the practicalities of officers that are going into a residence where they suspect that there could be some problematic interactions taking place, are supposed to have an oral argument about law. The way you're perceiving of it is what the officer should have said is, well, there's a doctrine called consent searches. And so if what you're asking is, am I lawfully here because I had a warrant to come into your residence? The answer is no, but I didn't need a warrant because I got your consent at the door. I mean, that's just not a realistic way of the way we would expect officers to interact with people in whose homes they've been invited. We don't even know what Mr. Turpin meant when he said, how is it that you came to be here? It's possible that that's what he's asking about the legal authority. It might well be, but I don't know that in that situation, what we say for qualified immunity purposes is that a reasonable officer, in order to avoid being determined to have engaged in unconstitutional entry into the house and subsequent search of the house, is supposed to have said in that situation, well, let me walk you through the Supreme Court case law and what a consensual search is. That just doesn't seem like what- Well, I agree with you that I wouldn't expect him to give a legal dissertation on consent. However, if in fact he believes that he did have consent, he could have merely said, well, Mr. Turpin- The question was, how is it that you came to be here? Is that what it was? I mean, we're analyzing this language as if it's a statute, but still, we can do that. But is that you're able to be in my house? I mean, I think the answer had to do with why they were at the house as opposed to in the house. I mean, I don't know that we- Because I think if the answer was we came to be here because we got some complaints about a disturbance, and that's factually accurate, I assume. And at that point, if the difference is why they're at the house as opposed to in the house, we're splitting things pretty finely as to what an officer is supposed to do in the course of a dynamic interaction within a residence where they've been invited to come in. Well, Your Honor, the whole concept of consent is supposed to be voluntary and so forth, and knowing to some extent. I mean, if that's their argument that, well, it was consensual and so forth, then he should be able to just state that and so forth and lay language. It doesn't have to be a legal thing. So what if he just- Is your argument that when Mr. Turpin asked that question, that that was a revocation? Let's just assume that there was consent to come in, because I think this argument assumes that. I know you don't want to give that away, but I think this part of your argument necessarily assumes that. And if we assume that, then is your argument that even if there was consent for the entry, that that consent was revoked when he asked the question, how is it that you came to be in my house? Right, because- That's a revocation of a consent, just to ask the question, how is it that you came to be in my house? Yes, because they are basically saying that, well, you said come in and you consented to everything and so forth. And if in fact- So what if the answer would have been, we're here because you consented to our coming in? Yes, why not? I'm sorry? Yes, your honor. Why couldn't he say that? Right, so what I'm saying, if he did say that in response, Mr. Turpin still would have asked the exact same question. And then, but if the officer would have said that in response, and then the question, if it's the answer to the question that determines whether the question is a revocation, then it's hard to see how the question can be a revocation. Well, I think that in legal terms that the cases sometimes refer to is that a statement, a question like that on behalf of Mr. Turpin is inconsistent with someone who consented to something. See, the problem for you is that later on when he did try and revoke the consent, he knew how to do it. He did it in very clear terms. It wasn't just a question. How did you happen to be here? That, as the chief is saying, that could be construed a lot of ways. It certainly was not an obvious revocation of consent. I want to ask you one thing, just to make sure there's no confusion in my mind. You're not doubting that the drugs were in plain view. Is that right? Apparently, the drugs were in plain view. I'm not arguing that. Okay, I just wanted to make sure I had the record straight in my head. Now, and also, I'm not consenting as to what type of drugs they were. No, no, no. I was just asking whether there's another way to argue the case if you're contesting plain view. But my understanding was that you are not, so that other way doesn't matter. No, I think the key thing is the sequence, when it occurred and so forth. And it's very clear from the evidence, from the body-worn camera footage, it's not a mystery that the issue regarding the plain view of the drugs was clearly after what I refer to as the revocation. The court, and so forth. I would refer to the clear revocation after the drugs were uncovered. Then he clearly said, I want you out of here. Then he said it. Well, your honor. He did. I mean, but that's not the only way that one can- I understand. We're going around in circles in that, but I get your point. I understand. And it wasn't, the reason I asked about plain view, when I looked at the video, it wasn't clear to me whether if I just walked into that bedroom, as the police were allowed to do, if I just looked on that night table, that I would know that those packages, whatever they were, were drugs. But you didn't raise that as an issue. Because I think the police opened whatever the package was. Let me say this, your honor. There's a lot of speculation on the other side as to when this occurred. He didn't come in and immediately say, give any indication that he saw the drugs in. The drugs. He didn't say anything about it. The only notification that came in was when he arrested Ms. Jackson. Up to that point, there was nothing said and so forth, and they were just talking. So you can't infer that as soon as they walked in the bedroom, well, okay, they saw it. If he saw it, he didn't say anything, and that's not, you can't make that assumption. He didn't go back to the bedroom, is that correct? Yes, he went out back to the bedroom without consent of that occurring also. And I wanted to say, I'm out of time, but I reserved some time. But I'm asking, when you say that, you're saying he went back to the bedroom after that? No, no, they were in the bedroom at that time. Everybody was in the bedroom at that time. And then one officer left Mr. Turpin after that. Right. Yeah, they forced Mr. Turpin to leave and so forth to go to another room while he interrogated Ms. Jackson or attempted to interrogate her. But I was just trying to get at your question about they never said anything about the drugs. Your statement suggests that everybody had gone to the living room or outside or something, and then somebody went back to find drugs, as opposed to already in the bedroom, and they could see the drugs. Yeah, they could see it. But in other words, no one, including the district court judge, could know when they saw it. The only way that one would know that they saw it, is when they made the arrest. That was the first time that that issue came up. There's nothing in the record. And once again, this is a case for a judgment on the pleadings. So you're very limited to what evidence you can use to make your argument. There was nothing that the district court knew about when they actually saw it for the first time. The first time that that comes out on the record was when the arrest was made. Up to that point, they were just talking, well, what are you doing? Well, why are you making all that noise? He asked that I don't know how many times. Well, what was going on? And there was nothing about the drugs. There was no arrest at that point. But what do you contend the arrest was for? Well, it was for the drugs and so forth, allegedly. But with respect to how one can make a statement, a definitive statement, as to when that occurred, you can't do that. You can't make an assumption that as soon as he walked in the bedroom, well, he saw it. Maybe he did, maybe he didn't. If he did, he didn't say anything about it. That wasn't an issue. You got to raise something like that. Yes, could it have been raised? Yes, could have. But when the second cop went back to the living room, there was a back and forth, and he said, what are you going to arrest me for? He said, drugs, I guess. So they had seen something, and they surmised they were drugs. They were passing. That was after the colloquy and so forth. That was after that discussion. Yeah. So they had seen the drugs by then, and they told him, we're going to arrest you for drugs. Oh, well, there's no dispute about that. They did. There came a time after the sequence, after the colloquy, and what I refer to as a revocation, and no, it wasn't. He didn't say, get out of my house at that time during the colloquy. But at the same time, his statements were totally inconsistent with someone who had given consent. Let me make it real clear for me. If you concede, and I'm not saying you should concede, if I had you in a chokehold and you had to concede that your revocation argument is wrong, it's not born by the record, so it's not on play, your client unfortunately would lose. Is that right? Well, if there was no- Wait, just for my head, I'm a slow thinker now, okay? If you had to concede or acknowledge that your revocation argument does not work, your client would lose, right? Yeah. If the revocation argument- We don't buy it. Well, I have to ask questions so that I understand how you're arguing. We don't buy it, you lose, right? Yeah, if there was no revocation, if there was no colloquy, then that's a different situation. Don't buy into the notion that he's slow thinking now. That's contradicted by everything any of us have seen. Okay, thank you, Counselor. Okay, and as I said, I did reserve some time. Thank you. Mr. Phillips. Good morning, and may it please the Court, Graham Phillips on behalf of the AAPA leads. I'll start with revocation because I think that is understandably where the focus was this morning. I think this revocation argument based on this question that Mr. Turpin asked fails for two independent reasons. So the first is just that this question did not evince a revocation of consent under the Fourth Amendment. And I think the appellants have not disputed our assertion that a revocation of consent under the Fourth Amendment needs to be unequivocal. They cite with approval the same authority that we do on the nature of what constitutes consent. So then the question is, is the question here, quote, how is it that you are able to be in my house, an unequivocal revocation of consent? I think the answer is definitely not. In the first place, I think there have been some questions that rightly raise what exactly does that question even mean as a question? It's not clearly a question about the officer's legal authority. And the way that Officer Lorraine answered it is he didn't take it as a question about his legal authority. The way he appeared to take it was a question about sort of why are you here? What is the what triggered you coming to my house? And he answers that it was because they got this call about a noise complaint, potential fighting. And Mr. Turpin does not respond. That's not my question. That's not what I was asking. He says, I didn't call you, which is a fine answer, but it certainly does not support the notion that the what he meant by his question was, what is your legal authority to be here? But even if you assume that the question was intended to mean or could be read as what is your legal authority to be here, a mere question about the officer's legal authority is not a revocation of consent. I mean, to start, it is only a question. And it's a question that you can imagine someone in this position asking for a very rational reason other than revoking consent. Consent to search. Excuse me, Your Honor. Consent to search. Well, I don't. The case is split up sometimes. Consent to enter. Maybe one thing is distinguished from consent to search. That's that's true, Your Honor. And your answer is this one. Again, I just want to make sure I'm understanding the arguments. Yeah. No, I don't think I was no consent to search. Right. We're our position doesn't hinge on him having consented to a search because he can't because it wasn't ever. So your argument is that that he consented to their entry into the room where where drugs were in plain view. And so it's not a case where they and that was impressed the trial, because I must say it was far from clear to me what was being picked up. If you pick up a bag and then you open it and start looking. I don't know that you can do that to make it in plain view, but that was impressed. Right. Yes, I agree. And that's I understand your position. But I do think the key thing is that has never been a disputed part of this case. So I just to get back to what I what I think this question could mean other than revoking consent. You can imagine that someone in this position wants to know, even if it is a question about legal authority, that they want to know, you know, do you have you also have a warrant? Because you could want to know that because it could inform how you interact with the police. You could want to know the nature of their legal authority so that you can decide whether I could revoke my consent later if I if this interaction starts to go in a direction that I don't I don't like. But to sort of put the point simply, you know, merely asking if the officers are there on the basis of consent is not the same thing as revoking consent. And I'm not aware of any case in any jurisdiction that sort of equates those concepts. So I think that's the simplest way to resolve this revocation argument. And and I think I think as counsel conceded here at the podium that that sort of is the end of the case. I do dispute the secondary matter dispute the sort of the timing argument. I think it certainly is true that that this question gets asked before the officers have actually sort of picked up the drugs or mentioned the drugs. But but when they mention or pick up the drugs is not the relevant inquiry. The relevant inquiry would be when when were the drugs in plain view, thereby creating probable cause? And I understand that that, you know, you could have questions about that. I do think the the baggie that on the video, it's not on the video. I think it is your honor. I think before this question gets asked, you know, you you can see the TV stand right there. And the objects that we're talking about were just sitting on the TV. We don't know what those objects are. You can't go very far with this. I mean, you're lucky it was never contested. It is not clear to me what they actually saw, because my first surmise was it was some it was a bag with something in it because they pulled something apart. And I would have argued as counsel, it's not plain view. We didn't see anything. It would cause you to know that was drug. Maybe you because you watching them and wondering whether they were under the influence, you just assumed maybe. So you started pulling things apart. You don't have much with that argument. Your only argument, as I understand this record, your only argument is it was never contested. Well, we certainly went on that basis alone. And I maybe I'll just leave it there then, because I do think I do think you don't need to get to that because of that concession or that forfeiture. You don't need to even get there unless you think the question was a revocation of consent. And for the reasons I've just discussed, I think it plainly is not. And you still have to deal with even if it got past that, you still have to deal with the standards for a judgment on the pleadings, too, because it would have to be in plain view. So plain that that would result in inclusion of plain view as at that threshold stage of the case, which is another complication. I think that could I mean, I think we would argue it, but I agree that that would be a complication in a case where the where the plainness of the view was actually disputed, but it was not below. It has not been here. Unless the court has any further questions, we'll ask that you affirm. Thank you, Mr. Phillips. Mr. Presley will give you two minutes for rebuttal. Well, just for the record, your honor, I had requested five minutes, five minutes. Sometimes the arguments go in a particular direction and there's only so much time left. I wanted to say a word about the another important issue in this case, and that is the come in statement and so forth. The other side is making a major issue about that statement. And just as your honor mentioned something about how in the colloquy, the statement could mean various things. Well, that certainly applies to come in. It's not as definitive as the other side would like. And once again, if you have a reasonable officer dealing with that particular issue, that particular officer would have to know that come in under normal circumstances is a situation where, let's say that someone comes up to your door, it's raining outside, their solicitor, you might say, well, come in. Does that mean that that person that you've asked to come in has the run of your house, can go to your bedrooms and so forth? That's absurd. And no reasonable officer would be able to draw that conclusion. And if in fact there was a serious concern about coming in and giving this statement, these two words, all of this power and so forth is, with all due respect, ridiculous and not something that should be considered in that way. People say come in and so forth, and the average person and so forth commonsensically understands what that means. If you ask anybody to come in inside, typically what it means is you step inside the door on the other side of the door, come in and say what you have to say. The officer ostensibly wanted to just talk, so to speak. Well, he also wanted to search, and that's obvious from the video. So from this argument, just so I'm understanding, this is acknowledging that come in means you can come inside the house. What you're saying is it doesn't necessarily talk about the scope of what you can do when you come in, but you're saying that it at least means you can come in the house. That's what it means under normal circumstances. Now, as to whether, obviously that didn't occur. If in fact that was really meant in that fashion, Mr. Turpin would not have stepped outside. He came to the door and stepped outside. Now, also it's very important to understand that Officer Lorraine also had a different understanding about what come in meant. He had the opportunity, if he really believed that it meant come in, he could have come in. The door was open, actually. He cracked the door open. This is all on the video. He cracked the door and reposed himself. If he thought that he really could come in, he would have come in. He didn't come in, and so forth. So he didn't really believe that it come in. Mr. Turpin didn't say when he came outside to talk, and so forth, which they originally agreed to when he was at the window when they first came up, and so forth. Mr. Turpin stayed outside. He didn't say, well, guys, okay, come in. He didn't really mean that. So just as you indicated about what I think is a revocation based on what he said, and so forth. At any rate, I see my time is out, but I think you understood my point. Thank you, Your Honor. Thank you, counsel, and thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Childs; Edwards